

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAUREEN HAYES,<br><br>        Plaintiff,<br><br>v.<br><br>NCO GROUP, INC. AND<br>SLM CORPORATION, AND<br>GC SERVICES LIMITED PARTNERSHIP,<br><br>        Defendants. | **COMPLAINT**<br><br>**10  ‌2389**<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION

1. Jurisdiction of this Court over claims against Defendant NCO Group, Inc. (hereinafter "Defendant NCO") arises under 28 U.S.C. § 1331 and pursuant to 15 U.S.C. § 1692k(d).

2. Jurisdiction of this Court over claims against Defendant GC Services Limited Partnership (hereinafter "Defendant GC Services") arises under 28 U.S.C. § 1331 and pursuant to 15 U.S.C. § 1692k(d).

3. Jurisdiction of this Court over claims against Defendant SLM Corporation (hereinafter "Defendant SLM") arises under 28 U.S.C. § 1367.

4. This action arises out of Defendant NCO's and Defendant GC Services' violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") in their illegal efforts to collect a consumer debt, and out of Defendant SLM's violations of the Pennsylvania Fair Credit Extension Uniformity Act 73 P.S.§ 2270 et seq. ("FCEUA").

5.   Venue is proper in this District because the acts and transactions underlying the action occurred here, Plaintiff resides here, and Defendants transact business here.

## PARTIES

6.   Plaintiff Maureen Hayes is a natural person who resides in the City of Philadelphia, County of Philadelphia, State of Pennsylvania, and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

7.   Defendant NCO is a collection agency operating from an address of 507 Prudential Road, Horsham, PA 19044 and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

8.   Defendant GC Services is a collection agency operating from an address of 6330 Gulfton St., Houston, TX 77081-1108 and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

9.   Defendant SLM is a student loan lender with headquarters at 12061 Bluemont Way, Reston, VA, 20190-5684 and is a "creditor" as that term is defined by 73 P.S. § 2270.3.

## FACTUAL ALLEGATIONS

### *Defendant SLM Harasses Plaintiff's Family 2007-2009*

10.   In August 2004 Plaintiff took out a private student loan from Defendant SLM in the amount of $10,000, which was used to attend Neumann College in Aston, PA.

11.   Plaintiff subsequently became delinquent on this loan as a result of being unemployed, and Defendant SLM began making collection calls to Plaintiff's father on average two times per day beginning in the middle of 2007.

12.   In the fall of 2007, Plaintiff contacted Defendant SLM to attempt to make arrangements to begin making payments on the loan.

13.   Plaintiff informed a Defendant SLM representative that she could afford to make payments on the loan at a rate of $50 per month.

14.   The Defendant SLM representative told Plaintiff to hold so that she could ask her supervisor whether Defendant SLM would accept $50 per month.

15.   The Defendant SLM representative returned to the line shortly thereafter and informed Plaintiff that Defendant SLM would not accept payments at the $50-per-month rate and that Defendant SLM would accept no less than $300 per month.

16.   Plaintiff informed the Defendant SLM representative that she simply did not have that kind of money and could not make a monthly payment that high.

17.   The Defendant SLM representative stated that Plaintiff must not realize how delinquent her loan was and that because it was already in default, Defendant SLM could begin garnishing her wages and her bank account; the conversation ended soon thereafter.

18.   Her $50-per-month offer having been rejected and being unable to afford $300 per month, Plaintiff felt that she had no choice but to continue not making payments on the loan.

19.   From the time of Plaintiff's conversation with Defendant SLM in the fall of 2007 until the summer of 2009, Defendant SLM continued to place collection calls to Plaintiff's father's residence on-average three times per week, despite the fact that each time that Plaintiff's father spoke to a Defendant SLM representative, he

informed the representative that he or she would need to speak with Plaintiff about the loan.

20. Throughout the summer of 2009, Defendant SLM representatives repeatedly and regularly placed collection calls to Plaintiff's grandmother and pressured her to ensure Plaintiff would begin making payments on the student loan.

21. Defendant SLM, by repeatedly calling Plaintiff's father over the course of more than two years, caused a telephone to ring or engaged a person in telephone conversation repeatedly or continuously with intent to annoy, abuse or harass any person at the called number; Defendant SLM therefore violated the PA FCEUA, specifically 73 P.S.§ 2270.4(b)(4)(v).

22. Defendant SLM, by repeatedly communicating with Plaintiff's grandmother without Plaintiff's consent with the aim of compelling grandmother to ensure Plaintiff began making payments on her debt, violated multiple provisions of the PA FCEUA including but not limited to 73 P.S.§ 2270.4(b)(3) and 2270.4(b)(4).

23. Defendant SLM, by stating that it could begin to garnish Plaintiff's wages and bank account, made a false, deceptive or misleading representation in connection with the collection of a debt; Defendant therefore violated multiple provisions of the PA FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(4), 2270.4(b)(5)(iv), and 2270.4(b)(5)(v).

24. As a direct and proximate result of Defendant SLM's PA FCEUA violations, Plaintiff experienced the complication of interpersonal relationships with her father and grandmother who continuously pressured Plaintiff to make the

harassment stop, and Plaintiff experienced great embarrassment from her relatives knowing about extremely personal debt problems and shame for not being able to make the harassment of her family cease by paying off her debt in full.

### *Defendant SLM sues Plaintiff*

25. On August 19, 2009, Defendant SLM sued Plaintiff in the Court of Common Pleas of Philadelphia County (Case No. 090802264) seeking a judgment of $15,100.12 on the note of the 2004 student loan, exclusive of court and attorney fees and costs.

26. This action was brought on behalf of Defendant SLM by its counsel Edwin A. Abrahamsen & Associates, P.C. (hereinafter "Abrahamsen & Associates").

27. On October 12, 2009, Edwin A. Abrahamsen & Associates reinstated the complaint on Defendant SLM's behalf.

28. Plaintiff received service of the complaint and first learned of the lawsuit against her on October 18, 2009.

29. Shortly thereafter, Plaintiff traveled to the office of undersigned counsel where she obtained representation in the case brought against her.

### *Plaintiff and Defendant SLM Reach Settlement Agreement*<br>*Resolving Lawsuit and Establishing Terms of Repayment of Entire Debt*

30. Throughout November 2009, undersigned counsel engaged in settlement negotiations with Attorney Heather Woodruff of Abrahamsen & Associates.

31.     Undersigned counsel proposed that Defendant SLM accept $50 per month with no interest accruing on the balance and that in exchange Plaintiff would not pursue legal action against Defendant SLM for the violations detailed above herein.

32.     Attorney Woodruff stated that she would have to check with her client Defendant SLM and get back to undersigned counsel.

33.     Attorney Woodruff explained that typically, for most of her other lender clients she would be able to make the agreement right away, but that Defendant SLM was extremely particular and required her to obtain authorization for each payment agreement that Abrahamsen & Associates wished to make.

34.     Several days later, Attorney Woodruff informed undersigned counsel that she had spoken to her client Defendant SLM and had received authorization from Defendant SLM to offer the terms which were ultimately memorialized in the settlement agreement dated November 27, 2009.  See Exhibit 1.

35.     The November 27, 2009 agreement was drafted by Abrahmsen & Associates as counsel for Defendant SLM and/or Defendant NCO, and it was subsequently signed by Plaintiff and Heather Woodruff, attorney at Abrahamsen & Associates.

36.     Specifically, the November 27, 2009 agreement called for Plaintiff to make $50 monthly payments directly to Abrahamsen & Associates beginning on December 20, 2009, with 0% interest accruing on the balance thereafter so long as payments continued to be timely made.

37.   The November 27, 2009 agreement also called for Abrahamsen & Associates to withdraw the civil complaint it had filed on behalf of Defendant SLM upon "clearance of funds of the first" $50 monthly payment by Plaintiff.

38.   Attorney Woodruff instructed undersigned counsel to direct Plaintiff to make her checks out to Edwin A. Abrahamsen & Associates, P.C., to write "N09-7153" in the Memo line of the checks, and to send all checks to EAA, 120 N. Keyser Ave., Scranton, PA 18504.

39.   Pursuant to the November 27, 2009 settlement agreement, Plaintiff sent a $50 check to Abrahamsen & Associates on December 11, 2009.

40.   Undersigned counsel believed the overall situation was resolved and bade farewell to Plaintiff who intended to continue making monthly payments to Abrahamsen & Associates.

41.   Accordingly, pursuant to the November 27, 2009 agreement, on December 31, 2009 Abrahamsen & Associates, acting on behalf of its client(s) Defendant SLM and/or Defendant NCO, filed with the Court of Common Pleas a Proposed Order to Discontinue the civil lawsuit against Plaintiff.

42.   As more fully described below, in its presentation of and signing the November 27th Agreement that its client and creditor Defendant SLM would not actually abide by and in its failure to inform Plaintiff as soon as Defendant SLM voiced its intent to violate the terms of the Agreement, Abrahamsen and Associates, which is a debt collector as defined by 15 U.S.C. § 1692a(6), committed numerous and

multiple violations of the FCDPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), and 1692f, amongst others.

43.    As more fully described below, in its hiring a law firm to make an agreement the terms of which it failed to take reasonable steps to fulfill, in its agent law firm's creation of terms that were not minimally abided by, in its failure to take reasonable steps to secure Defendant SLM's fulfillment of the terms in the agreement, and in its failure to itself abide by the terms contained therein, Defendant NCO violated numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), and 1692f, amongst others.

44.    Defendant SLM's authorization and/or hiring of a law firm and/or Defendant NCO to make an agreement that Defendant SLM did not intend to keep constituted violations of numerous and multiple provisions of the FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(6) generally and 73 P.S.§ 2270.4(b)(6)(1) specifically; as well as 73 P.S.§ 2270.4(b)(5) generally and 73 P.S.§ 2270.4(b)(5)(ii), 2270.4(b)(5)(x) specifically, amongst others.

*GC Services Begins Collection Efforts in Mid-December 2009*

45.    By December 2009, Plaintiff was 7.5 months pregnant and extremely weak and fragile.

46.    On December 10, 2009, the day before she sent the first $50 check to Edwin A. Abrahamsen & Associates pursuant to the November 27, 2009 agreement, Plaintiff received a dunning letter from GC Services dated December 7, 2009 claiming that

Plaintiff owed Defendant SLM a balance of $18,835.63, nearly four thousand dollars more than the amount agreed upon in the November 27, 2009 agreement.

47.   Plaintiff was surprised to receive such a letter after reaching an agreement with Defendant SLM weeks earlier, but she assumed that GC Services' collection efforts would cease as soon as her first check to Edwin A. Abrahamsen & Associates was received and processed.

48.   On December 11, 2009, Plaintiff sent the first $50 check to Edwin A. Abrahamsen & Associates pursuant to the November 27, 2009 agreement.

49.   Beginning on December 14, 2009, Plaintiff began receiving at least two calls daily from GC services.

50.   Plaintiff did not answer the phone during the first few days of these calls because she believed that they would cease as soon as her first payment was processed.

51.   The Defendant GC Services dunning letter demanding $18,890.41 after Plaintiff had reached an agreement with Defendant SLM on a lesser sum weeks earlier, along with the frequent telephone calls to Plaintiff, represented efforts to collect an unauthorized sum and collectively violated numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(5), 1692e(10), 1692f, and 1692f(1), amongst others.

52.   Defendant SLM's authorization of GC Services to attempt to collect $18,890.41 after Defendant SLM reached an agreement with Plaintiff in the amount of $15,469.10 on November 27, 2009, constituted violations of numerous and multiple provisions of the Pennsylvania FCEUA, including but not limited to 73

P.S.§   2270.4(b)(4),   2270.4(b)(4)(v),   2270.4(b)(5),   2270.4(b)(5)(ii), and 2270.4(b)(5)(x).

53.   These FDCPA violations by Defendant GC services and the PA FCEUA violations by Defendant SLM directly and proximately caused significant emotional distress, frustration, and consternation.

### *Defendant GC Services' First Abusive Call, December 16, 2009*

54.   On December 16, 2009, a female Defendant GC Services representative called Plaintiff on her cell phone while Plaintiff was driving.

55.   The Defendant GC Services representative stated that she was calling from Defendant GC Services to "settle" a debt of nearly $19,000.

56.   The GC Services representative stated that although Plaintiff owed $19,000, Defendant GC Services was authorized to reduce the total debt to $15,000 if Plaintiff was able to pay the full $15,000 immediately.

57.   Plaintiff stated that she had already reached an agreement with Defendant SLM, and she summarized the terms of the November 27, 2009 agreement.

58.   Plaintiff further stated that she had already made the first payment on that agreement on December 11, 2009, and that it should have been processed by now.

59.   The Defendant GC Services representative stated that no such payment had been made on the loan.

60:   The Defendant GC Services representative aggressively stated that she needed a payment now.

61.   Plaintiff informed Defendant GC Services that she was confused because she had been working with a lawyer who helped broker the agreement with Defendant SLM and the lawyer had assured her that collectors should no longer be calling her.

62.   The Defendant GC Services representative demanded the name and number of Plaintiff's attorney.

63.   Plaintiff, who was driving at the time, stated that she did not have the information at hand but that she could have her lawyer contact the Defendant GC Services representative.

64.   The Defendant GC Services representative raised her voice and stated sharply that if Plaintiff was telling the truth and actually had a lawyer, then she wouldn't be having such difficulty providing his name and number.

65.   Plaintiff responded that she was not lying but that she was driving at the moment and could not continue such a rude conversation any further.

66.   As a direct and proximate result of this abusive conversation with Defendant GC Services, Plaintiff was sick to her stomach, experienced severe headaches and a racing heart, felt belittled and embarrassed, and felt extremely angry and frustrated that she seemed to be back at square one with respect to resolving her loan.

67.   This call on this occasion from Defendant GC Services to Plaintiff was a collection communication in violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), amongst others.

68.  Defendant SLM's authorization of GC Services to make such collection calls attempting to collect $18,890.41 after Defendant SLM reached an agreement with Plaintiff in the amount of $15,469.10 on November 27, 2009, constituted violations of numerous and multiple provisions of the Pennsylvania FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(4), 2270.4(b)(4)(v), 2270.4(b)(5), 2270.4(b)(5)(ii), and 2270.4(b)(5)(x).

69.  As a direct and proximate result of Defendant SLM's PA FCEUA violations, Plaintiff was rendered sick to her stomach, experienced severe headaches and a racing heart, felt belittled and embarrassed, and felt extremely angry and frustrated that she seemed to be back at square one with respect to resolving her loan.

### GC Services' Second Abusive Call, Late December 2009

70.  Between December 16, 2009 and December 24, 2009, Defendant GC Services caused Plaintiff's phone to ring on average two times per day.

71.  Plaintiff did not answer these calls because she hoped that Defendant GC Services was only calling because her first $50 payment to Abrahamsen & Associates had not yet been processed and that the calls would cease as soon as it was processed.

72.  At some time during the last week in December, 2009, however, Plaintiff did answer the phone and was connected to a male Defendant GC Services representative.

73.  The Defendant GC Services representative stated that he was willing to drop the amount due on the student loan from $19,000 to $15,000 if Plaintiff started making payments immediately.

74.   Plaintiff stated that she had a lawyer who had already made an agreement on her behalf with Defendant SLM to repay the debt in an amount approximating $15,000 at a rate of $50 per month with no interest, and she stated that she had already begun making payments on that agreement.

75.   The Defendant GC Services representative stated that Plaintiff had not yet made any payments on the debt.

76.   Plaintiff stated that yes, she had begun making payments.

77.   Plaintiff stated that she was 8 months pregnant and did not have the energy to deal with this now.

78.   Plaintiff reiterated that she had already made an agreement with Defendant SLM and asked Defendant GC Services to please stop harassing her while she was pregnant.

79.   The Defendant GC Services representative stated that he was sorry that Plaintiff had a "medical condition" but that the loan situation needed to be resolved "now."

80.   Plaintiff responded that it already was resolved, at which point the Defendant GC Services representative unceremoniously and rudely hung up on Plaintiff.

81.   As a direct and proximate result of this abusive conversation with Defendant GC Services, Plaintiff was sick to her stomach, experienced severe headaches and a racing heart and extreme light-headedness, felt belittled and embarrassed, felt terrified that the stress from the collector harassment was jeopardizing her pregnancy and her health, and felt extremely angry and frustrated that Defendant GC Services would not stop harassing her.

82.   This call on this occasion from Defendant GC Services to Plaintiff was a collection communication in violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), amongst others.

83.   Defendant SLM's authorization of GC Services to make such collection calls attempting to collect $18,890.41 after Defendant SLM reached an agreement with Plaintiff in the amount of $15,469.10 on November 27, 2009, constituted violations of numerous and multiple provisions of the Pennsylvania FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(4), 2270.4(b)(4)(v), 2270.4(b)(5), 2270.4(b)(5)(ii), and 2270.4(b)(5)(x).

84.   As a direct and proximate result of Defendant SLM's PA FCEUA violations, Plaintiff was rendered sick to her stomach, experienced severe headaches and a racing heart and extreme light-headedness, felt terrified that the stress from the collector harassment was jeopardizing her pregnancy and her health, felt belittled and embarrassed, and felt extremely angry and frustrated that debt collectors would not stop harassing her.

### GC Services Third Abusive Call, January 20, 2010

85.   At the end of December 2009, Plaintiff was diagnosed with preeclampsia and hypertension and Plaintiff's Ob-Gyn placed her on homebound medical bed rest until childbirth.

86.   Throughout January 2010, Defendant GC Services repeatedly caused Plaintiff's phone to ring at least twice daily, but Plaintiff did not answer because her doctor had advised her to avoid all stressful encounters.

87.   Plaintiff's physician advised Plaintiff to closely monitor her blood pressure with a home monitoring machine, and Plaintiff noticed that each time she received a call from Defendant GC Services, her blood pressure spiked.

88.   On January 11, 2010, Plaintiff sent the second $50 monthly payment to Edwin A. Abrahamsen & Associates pursuant to the November 27, 2010 agreement.

89.   On January 20, 2010 at 10:03 AM, Plaintiff couldn't take the ringing generated by Defendant GC Services any longer and answered the phone with hopes of finally convincing Defendant GC Services to stop harassing her during her pregnancy.

90.   The Defendant GC Services representative began by reiterating his company's offer to reduce the debt from $19,000 to $15,000 if Plaintiff began making payments immediately.

91.   Plaintiff stated that the situation was already resolved, and she again explained the existence and terms of the November 27, 2009 agreement with Defendant SLM.

92.   The Defendant GC Services representative stated that he needed Plaintiff's lawyer's name and address so that he could look him up.

93.   Plaintiff, who was lying down more than eight month's pregnant in her bed and could not move to obtain her lawyer's address, provided her lawyer's name but stated that she couldn't remember the exact address; instead she provided the name of the street of her lawyer's office.

94. The Defendant GC Services representative stated that he was going to check to see if such a lawyer actually existed in Philadelphia and then rudely and unceremoniously hung up on Plaintiff.

95. As a direct and proximate result of this abusive conversation with Defendant GC Services, Plaintiff was sick to her stomach; experienced severe headaches, a racing heart, extreme light-headedness, and a spike in her blood pressure; felt belittled and embarrassed; felt extremely angry and frustrated that Defendant GC Services would not stop harassing her; and felt terrified that the stress of her interactions with Defendant GC Services was jeopardizing her pregnancy and her own health.

96. This call on this occasion from Defendant GC Services to Plaintiff was a collection communication in violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), amongst others.

97. Defendant SLM's authorization of GC Services to make such collection calls attempting to collect $18,890.41 after Defendant SLM reached an agreement with Plaintiff in the amount of $15,469.10 on November 27, 2009, constituted violations of numerous and multiple provisions of the PA FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(4), 2270.4(b)(4)(v), 2270.4(b)(5), 2270.4(b)(5)(ii), and 2270.4(b)(5)(x).

98. As a direct and proximate result of Defendant SLM's PA FCEUA violations, Plaintiff was rendered sick to her stomach; experienced severe headaches, a racing heart, extreme light-headedness, and a spike in her blood pressure; felt belittled

and embarrassed; felt extremely angry and frustrated that debt collectors would not stop harassing her and that the loan situation remained unresolved; and felt terrified that the stress of her interactions with debt collectors was jeopardizing her pregnancy and her own health.

### GC Services Fourth Abusive Call, January 20, 2010

99.   One half hour later, the same male Defendant GC Services representative called Plaintiff while she was resting in her bed.

100.   The Defendant GC Services representative stated that he had searched for her lawyer's name and that there was no lawyer named Dov Sacks practicing law in the city of Philadelphia.

101.   Plaintiff stated that she was not lying and that she knew her own lawyer's name.

102.   Plaintiff stated that if the Defendant GC Services representative needed to speak to her lawyer, she would have her lawyer contact him.

103.   The Defendant GC Services representative stated that if Plaintiff were really making payments already, there was no reason Plaintiff should be paying a lawyer.

104.   The Defendant GC Services representative stated that it was obvious that Plaintiff did not even have a lawyer.

105.   The Defendant GC Services representative asked to whom Plaintiff was making her payments on the student loan.

106.   Plaintiff answered that she was making payments to  a law firm, Abrahamsen & Associates.

107.  The Defendant GC Services representative stated that Plaintiff should call the law firm and see where her money was going because as far as Defendant GC Services was concerned, Plaintiff had not made any payments on the debt.

108.  As a direct and proximate result of this abusive conversation with Defendant GC Services, Plaintiff was sick to her stomach; experienced severe headaches, a racing heart, extreme light-headedness, and a spike in her blood pressure; felt belittled and embarrassed; felt extremely angry and frustrated that Defendant GC Services would not stop harassing her and that the loan situation remained unresolved; and felt terrified that the stress of her interactions with Defendant GC Services was jeopardizing her pregnancy and her own health.

109.  This call on this occasion from Defendant GC Services to Plaintiff was a collection communication in violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), amongst others.

110.  Defendant SLM's authorization of GC Services to make such collection calls attempting to collect $18,890.41 after Defendant SLM reached an agreement with Plaintiff in the amount of $15,469.10 on November 27, 2009, constituted violations of numerous and multiple provisions of the Pennsylvania FCEUA, including but not limited to 73 P.S.§ 2270.4(b)(4), 2270.4(b)(4)(v), 2270.4(b)(5), 2270.4(b)(5)(ii), and 2270.4(b)(5)(x).

111.  As a direct and proximate result of Defendant SLM's PA FCEUA violations, Plaintiff was rendered sick to her stomach; experienced severe headaches, a racing

heart, extreme light-headedness, and a spike in her blood pressure; felt belittled
and embarrassed; felt extremely angry and frustrated that debt collectors would
not stop harassing her and that the loan situation remained unresolved; and felt
terrified that the stress of her interactions with debt collectors was jeopardizing her
pregnancy and her own health.

### Plaintiff's January 20, 2010 Conversation with Attorney Woodruff
### Reveals Scope of FDCPA and FCEUA Violations

112.   Within two hours of speaking with the Defendant GC Services representative,
Plaintiff called attorney Heather Woodruff and asked her why she was receiving
collection calls when she was abiding by the terms of the November 2009
agreement.

113.   Attorney Woodruff stated that Defendant SLM had concluded that Plaintiff had
made her initial payment to Abrahamsen & Associates "too late" and that
Defendant SLM had therefore decided to re-assign the case to another collection
company to collect on the student loan as if the November 27, 2009 agreement did
not exist.

114.   Plaintiff stated that she didn't understand because she had made her first payment
well before the December 20, 2009 deadline for initial payment specified in the
November 27, 2009 agreement.

115.   Attorney Woodruff stated that she knew that Plaintiff had met the deadline
specified in the agreement but that Defendant SLM nevertheless decided that it
was too late for Defendant SLM.

116. Attorney Woodruff stated that she was sorry that this had happened but that these kinds of things happen in Pennsylvania sometimes because in Pennsylvania, Defendant SLM had the discretion to renege on agreements like the one Plaintiff had made.

117. Plaintiff asked why no one had informed her that the November 27, 2009 agreement was not being honored.

118. Attorney Woodruff stated she would make sure that Plaintiff's two checks would be returned uncashed to Plaintiff, and the phone conversation ended soon thereafter.

119. On February 10, 2010, two and one half months after the November 27, 2009 settlement agreement was signed and after Plaintiff had made two timely monthly payments pursuant to that agreement, Edwin A. Abrahamsen & Associates, P.C. returned Plaintiff's two checks along with a letter.

120. This letter made no mention of the settlement agreement; it simply stated that "We have recently been informed that your file has been recalled by our client, NCO Financial Systems, and we can no longer process your payments. Please forward all future correspondence and payment to NCO Financial Systems or call them direct at 1-800-550-9619." See Exhibit 2.

121. This letter was sent directly to Plaintiff, not to undersigned counsel, and no copy of this letter was sent to undersigned counsel.

122.   Subsequent to November 27, 2009, Defendant SLM re-assigned the delinquent student loan from Defendant NCO to Defendant GC Services Limited Partnership for collections.

123.   Near the end of February 2010, Defendant SLM again re-assigned the delinquent student loan account from Defendant GC Services Limited Partnership to yet another collection company which has called Plaintiff on numerous occasions attempting to collect on the debt.

124.   On May 7, 2010, Defendant SLM informed undersigned counsel that on November 27, 2009, the date of the settlement agreement, Defendant NCO was the debt collection agency assigned to the Defendant SLM account; therefore on that date, Defendant NCO was empowered by Defendant SLM account to collect on the account and to make agreements regarding the account.

125.   Abrahamsen and Associates, in its presentation of and signing the November 27th Agreement that its client and creditor Defendant SLM would not actually abide by, in its failure to inform Plaintiff as soon as Defendant SLM voiced its intent to violate the terms of the Agreement, and in its communication with Plaintiff repeatedly after it knew Plaintiff was represented by undersigned counsel, committed numerous and multiple violations of the FCDPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(2), 1692e(10), and 1692f, amongst others.

126. At all times after November 27, 2009, Defendant NCO knew or should have known about the November 27, 2009 agreement signed by Abrahamsen & Associates and Plaintiff.

127. Defendant NCO's hiring a law firm to make an agreement it did not intend to keep, its violation of the settlement agreement by refusing to accept payments as per the terms of the agreement, its communication with Plaintiff repeatedly after it knew Plaintiff was represented by undersigned counsel, and its failure to inform Plaintiff that it would be refusing to honor the agreement terms and that the account was being turned over to another collection company violated numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, and 1692f, amongst others.

128. As a direct and proximate result of Defendant NCO's violations of the FDCPA, Plaintiff was subjected to a prolonged period of stress and anxiety from fear that her pregnancy and her health was being jeopardized, as detailed above.

129. These violations, inflicted upon Plaintiff during the final trimester of a complicated pregnancy and/or while on medical bed rest and the reality that all of her efforts to reach an agreement related to repayment of the debt had come to naught caused Plaintiff great frustration, anger, anxiety during a time of great fragility.

130. At all times after November 27, 2009, Defendant SLM knew or should have known about the November 27, 2009 agreement.

131.   Defendant SLM's authorization and/or hiring of a law firm and/or Defendant NCO
to make an agreement that Defendant SLM did not intend to keep; its failure to
honor the November 27, 2009 agreement when it knew or should have known of
the existence of the agreement; its re-assignment of the account to multiple
additional debt collectors thereafter; and its attempt to have collected on its behalf
an amount greater than the amount specified in the November 27, 2009 agreement
constitute violations of numerous and multiple provisions of the FCEUA, including
but not limited to 73 P.S.§ 2270.4(b)(6) generally and 73 P.S.§ 2270.4(b)(6)(1)
specifically; as well as 73 P.S.§ 2270.4(b)(5) generally and 73 P.S.§
2270.4(b)(5)(ii), 2270.4(b)(5)(x) specifically, amongst others.

132.   As a direct and proximate result of Defendant SLM's violations of the PA
FCEUA, Plaintiff was subjected to a prolonged period of stress and anxiety from
fear that her pregnancy and her health was being jeopardized as detailed above,
which was caused by her subjection to the collection tactics of multiple debt
collection companies including Defendant NCO and Defendant GC Services.

133.   These violations, inflicted upon Plaintiff during the final trimester of a
complicated pregnancy and/or while on medical bed rest and the reality that all of
her efforts to reach an agreement related to repayment of the debt had come to
naught caused Plaintiff great frustration, anger, anxiety during a time of great
fragility.

## RESPONDEAT SUPERIOR LIABILITY

134.   The acts and omissions of each and every representative of Defendant NCO who were employed as agents by Defendant NCO and who communicated with Plaintiff as more further described herein, were committed within the time and space limits of their agency relationship with their principal, Defendant NCO.

135.   Specifically, Abrahamsen & Associates and Attorney Heather Woodruff, were at all times they were communicating with Plaintiff, acting as an agent of their principal Defendant NCO, and were serving as debt collectors on behalf of their principal NCO.  See Exhibit 2.

136.   The acts and omissions by the representatives of Defendant NCO, who were acting as debt collectors, were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant NCO in collecting consumer debts.

137.   By committing these acts and omissions against Plaintiff in their capacity as debt collectors, the representatives of Defendant NCO were motivated to benefit their principal, Defendant NCO.

138.   Defendant NCO is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of state and federal law by its representatives, agents, and collection employees, including but not limited to violations of the FDCPA, in their attempts to collect this debt from Plaintiff.

139. The acts and omissions of each and every representative of Defendant GC Services who were employed as agents by Defendant GC Services and who communicated with Plaintiff as more further described herein, were committed within the time and space limits of their agency relationship with their principal, Defendant GC Services.

140. The acts and omissions by the representatives of Defendant GC Services, who were acting as debt collectors, were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant GC Services in collecting consumer debts.

141. By committing these acts and omissions against Plaintiff in their capacity as debt collectors, the representatives of Defendant GC Services were motivated to benefit their principal, Defendant GC Services.

142. Defendant GC Services is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of state and federal law by its representatives, agents, and collection employees, including but not limited to violations of the FDCPA, in their attempts to collect this debt from Plaintiff.

143. The acts and omissions of each and every representative of Defendant SLM who were employed as agents by Defendant SLM and who communicated with Plaintiff as more further described herein, were committed within the time and space limits of their agency relationship with their principal, Defendant SLM.

144. Specifically, Abrahamsen & Associates and Attorney Heather Woodruff, were at all times they were communicating with Plaintiff, were acting as an agent of their

-25-

principal Defendant SLM, and were serving as debt collectors on behalf of their principal SLM, as evidenced by their representation of Defendant SLM in Case No. 090802264 in The Court of Common Pleas of Philadelphia County.

145.   The acts and omissions by the representatives and agents of Defendant SLM were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant SLM in communicating with customers and perceived debtors of Defendant SLM.

146.   By committing these acts and omissions against Plaintiff in their capacity as agents of the creditor Defendant SLM, the representatives of Defendant SLM were motivated to benefit their principal, Defendant SLM.

147.   Defendant SLM is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of state and federal law by its representatives, including but not limited to violations of the PA FCEUA, in their attempts to collect this debt from Plaintiff.

## TRIAL BY JURY

148.   Plaintiff is entitled to and hereby respectfully demands a trial by jury on all issues so triable. US Const. amend. 7. Fed.R.Civ.P. 38.

## CAUSES OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

### 15 U.S.C. § 1692 et seq.

149.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

150.   The foregoing acts and omissions of Defendant NCO and its agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq., with respect to Plaintiff.

151.   As a result of Defendant NCO's violations of the FDCPA, Plaintiff is entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3), from Defendant NCO herein.

152.   The foregoing acts and omissions of Defendant GC Services and its agents constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq., with respect to Plaintiff.

153.   As a result of Defendant GC Services' violations of the FDCPA, Plaintiff is entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and,

reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3), from Defendant GC Services herein.

## COUNT II.

### VIOLATIONS OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT

### 73 P.S. § 2270 et seq.

154. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

155. The foregoing acts and omissions of Defendant SLM and its agents constitute numerous and multiple violations of the Pennsylvania FCEUA including, but not limited to, each and every one of the above-cited provisions of the FCEUA, 73 P.S. § 2270 *et seq.*, with respect to Plaintiff.

156. Pursuant to 73 P.S.§ 2270.5(a), the commission of an unfair or deceptive debt collection act or practice under the Pennsylvania Fair Credit Extension Uniformity Act constitute a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

157. Pursuant to 73 P.S. § 201-9.2(a) of the Pennsylvania Unfair Trade Practices, and Consumer Protection Law, Defendant SLM violations of the Pennsylvania Fair Credit Extension Uniformity Act entitle Plaintiff to recovery for actual damages or dollars ($100), whichever is greater, with the additional provision that the court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100); reasonable attorney's fees and costs

pursuant to 73 P.S. § 201-9.2(a), from Defendant SLM herein; and any additional

relief as the court deems necessary and proper pursuant to 73 P.S. § 201-9.2(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant:

## COUNT I.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. § 1692 et seq.

- for an award of actual damages pursuant to 15 U.S.C. § 1692k(a)(1) against each

  of Defendant NCO and against Defendant GC Services and for Plaintiff;

- for an award of statutory damages of $1,000.00 pursuant to 15 U.S.C.

  §1692k(a)(2)(A) against each of Defendant NCO and against Defendant GC

  Services and for Plaintiff;

- for an award of costs of litigation and reasonable attorney's fees pursuant to 15

  U.S.C. § 1692k(a)(3) against each of Defendant NCO and against Defendant GC

  Services and for Plaintiff; and

- for such other and further relief as may be just and proper.

## COUNT II.

## VIOLATIONS OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT

## 73 P.S. § 2270 et seq.

- for an award of treble actual damages pursuant to 73 P.S. § 201-9.2(a) against

  Defendant SLM and for Plaintiff;

- for an award of costs of litigation and reasonable attorney's fees pursuant to 73 P.S. § 201-9.2(a) against Defendant SLM and for Plaintiff; and

- for an order forcing Defendant SLM to abide by terms no less beneficial to Plaintiff than those contained in the agreement signed on November 27, 2009.

- for such other and further relief as may be just and proper.


Respectfully submitted,

Dated: May 12, 2010

**Dov Sacks**

By:  **s/Dov Sacks**
Dov Sacks, Esq.
Attorney I.D.#206474
3638 N. Broad Street
Philadelphia, PA 19140
Telephone:  (215) 227-2400, ext. 2427
Facsimile: (215) 227-6486
cdsacks@clsphila.org

cds

**Attorney for Plaintiff**

# Exhibit
# 1



EDWIN A. ABRAHAMSEN
MICHAEL F. RATCHFORD
HEATHER K. WOODRUFF*

* ALSO A MEMBER OF FL BAR

THE LAW OFFICE OF
EDWIN A. ABRAHAMSEN & ASSOCIATES. PC
WWW.EAA-LAW.COM

MAUREEN HAYES                     November 27, 2009
1010 FANSHAWE ST
PHILADELPHIA PA 19111-4804

RE:    Monthly Payment Agreement - File # N09-7153
       Original Creditor: SALLIE MAE
       Original Account Number: 1786463490102
       Current Balance: $15,469.10

Pursuant to your recent conversation with Edwin A. Abrahamsen & Associates regarding the above referenced account an agreement to resolve the outstanding debt has been reached. The terms of the agreement are as follows:

1. Both parties to this agreement have agreed to the following payment plan: Monthly payments of $50.00 commencing on December 20, 2009 and continuing to be due on or before the 20th day of each month thereafter until the balance is paid in full.
2. Interest on the balance will be reduced to 0.00% with processing of the 1st payment. It will remain at 0.00%, as long as payments are made as agreed.
3. Payments will be made to Edwin A. Abrahamsen & Associates, P.C. and must be received in our office on or before the due date.
4. Upon clearance of funds of the first payment, the civil complaint in this action will be Withdrawn.

Upon completion of all payments your credit will be fully amended to reflect a paid-in-full account. If you have any questions, please contact our office at (800) 503-1665 ext.100.

Enclosed please find two copies of this agreement. Please sign and return one copy to our office and keep one copy for your records.

Abrahamsen & Associates, P.C.                    MAUREEN HAYES

MAUREEN HAYES

This is a communication from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

120 N KEYSER AVE          SCRANTON, PA 18504        (P) 570.558.5510          (F) 570.558.5511

# Exhibit
# 2



**THE LAW OFFICE OF**
EDWIN A. ABRAHAMSEN & ASSOCIATES, P.C.

WWW.EAA-LAW.COM

EDWIN A. ABRAHAMSEN
MICHAEL F. RATCHFORD
HEATHER K. WOODRUFF*
*ALSO MEMBER OF FL BAR

February 10, 2010

Maureen Hayes
1010 Fanshawe St
Philadelphia, PA 19111-4804
File Number N09-7153

Dear Maureen,

Enclosed please find your two checks for $50.00 each. We have recently been informed that your file has been recalled by our client, NCO Financial Systems, and we can no longer process your payments. Please forward all future correspondence and payment to NCO Financial Systems or call them direct at 1-800-550-9619.

Sincerely,

*Diane Kanavy*

Diane Kanavy
Accounting Department
Edwin A. Abrahamsen & Associates, P.C.

This is a communication from a debt collector in an attempt to collect a debt. Any information obtained will be used for that purpose.

Enclosure

*This is a communication from a debt collector. Any information obtained can be used for that purpose.*

120 NORTH KEYSER AVENUE • SCRANTON, PA 18504 • (P) 570.558.5510 • (F) 570.558.5511

## VERIFICATION OF COMPLAINT AND CERTIFICATION

STATE OF PENNSYLVANIA         )
                                     ) ss

COUNTY OF PHILADELPHIA   )

Plaintiff Maureen Hayes, having first been duly sworn and upon oath, deposes and says as follows:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.
6. Each and every exhibit I have provided to my attorneys which has been attached to this Complaint is a true and correct copy of the original.
7. Except for clearly indicated redactions made by my attorneys where appropriate, I have not altered, changed, modified, or fabricated these exhibits, except that some of the attached exhibits may contain some of my own handwritten notations.

*Maureen Hayes*
Maureen Hayes

Subscribed and sworn to before me
this 12TH day of May, 2010.